```
                 UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

PHYSICIAN'S HEALTHSOURCE, INC.  :  No. 3:12cv-1208 (SRU)
                                :  915 Lafayette Boulevard
            vs.                 :  Bridgeport, Connecticut
                                :
                                :  May 21, 2013
PURDUE PHARMA, LP, ET AL        :

- - - - - - - - - - - - - - - - x



                     MOTION HEARING


B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

    FOR THE PLAINTIFF:

            ANDERSON & WANCA
                3701 Algonquin Road
                Rolling Meadows, Illinois  60008
            BY:  GEORGE K. LANG, ESQ.

            SCOTT & SCOTT, LLP
                156 South Main Street, P. O. Box 192
                Colchester, Connecticut  06415
            BY:  ERIN GREEN COMITE, ESQ.

    FOR THE DEFENDANT:

            WIGGIN & DANA
                265 Church Street, P. O. Box 1832
                New Haven, Connecticut  06508
            BY:  JAMES I. GLASSER, ESQ.
                NATALE S. ELICKER, ESQ.

            NELSON MULLINS RILEY & SCARBOROUGH LLP
                One Post Office Square
                Boston, Massachusetts   02109
            BY:  PATRICK CLENDENEN, ESQ.
```

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut   06604
Tel: (917)703-0761

```
 1                    (11:00 O'CLOCK, A. M.)
 2              THE COURT:  Good morning.  We're here in
 3   Physicians Healthsource, Inc. v. Purdue Pharma, LL - or
 4   LP, I guess.  Could I have appearances, please?
 5              MR. GLASSER:  Yes.  Good morning, Your Honor.
 6   Jim Glasser on behalf of Purdue.  Appearing with me at
 7   counsel table is Natalie Elicker.
 8              MR. CLENDENEN:  Pat Clendenen from Nelson
 9   Mullins on behalf of co-defendant, Peer Group, Inc.
10              MR. GLASSER:  I should mention, Your Honor, that
11   Mr. Silbert, Rich Silbert, Mike Penagrossi and Julie
12   Marion (ph) are here from Purdue's legal department, Your
13   Honor.
14              THE COURT:  All right, thank you.
15              MR. LANG:  Good morning, Your Honor.  George
16   Lang from Anderson & Wanca, on behalf of the plaintiffs.
17              MS. COMITE:  Good morning, Erin Comite, Scott &
18   Scott, on behalf of plaintiffs.
19              THE COURT:  Okay.  And we're here on the motion
20   to dismiss the amended complaint.
21              There are a lot of arguments here.  I'm not
22   really sure where to begin.  So maybe, Mr. Glasser, I'll
23   just let you make a classic argument.
24              MR. GLASSER:  Happy to, Your Honor.  Thank you.
25              You're right, Your Honor, we were here before
```

1    the Court once before.  I think it was in the dead of

2    Winter if I recall correctly.  We had moved to dismiss the

3    complaint filed by Physicians Healthsource Inc. and also

4    move for summary judgment and to strike the class

5    allegations.

6         As Your Honor will recall, the original

7    complaint alleged class claims based on the absence of an

8    established business relationship and in the absence of

9    consent to receive a fax.

10        As it developed, of course, there was an

11   established business relationship and there was

12   significant evidence, as presented to the Court in summary

13   judgment motions that there were requests, specific

14   requests made to receive the facsimiles.

15        Just by way of background, Your Honor, the

16   plaintiff here is a physicians group.  Purdue, as you

17   know, is a manufacturer of various pharmaceutical products

18   which were used by this physicians group.

19        Purdue has agents who visited regularly with

20   PHI.  According to many records that are now in the court

21   file, there were 104 visits, 149 and 176 visits to

22   individuals of the practice groups where they engaged in

23   discussions about Purdue products, engaged in educational

24   lunches.  Various of the individuals whose faxes were sent

25   participated in lunch and educational programs sponsored

1    by the agent of Purdue.

2              In the course of the documents presented to the

3    Court in connection with the summary judgment motion, it

4    became evident in the detailer's notes that certain of the

5    the invitations to these educational events were

6    specifically requested by certain of the PHI employees.

7              THE COURT:  Although that is disputed, isn't it?

8              MR. GLASSER:  It's disputed by defendants,

9    the -- excuse me, it's disputed by plaintiffs, that's

10   true, Your Honor, but the records will, we believe, show

11   that if it comes to that.  That was the first complaint.

12             As Your Honor may recall, in argument to that

13   motion, it became apparent that class was not necessarily

14   going to survive, or at least to those observers, it

15   became apparent and plaintiffs made a determination to

16   file an amended complaint.

17             I want to go back to the facts because I think

18   it's important for understanding the statute.  They had

19   this ongoing relationship.  Every single fax sent to PHI

20   had an opt-out notice which said if you don't want to

21   receive anymore, call this toll free number and we'll stop

22   sending them to you.

23             But in addition to the opt-out notice, as I

24   said, these agents were having lunches, regularly

25   visiting.  If there was a request or desire not to receive

1    anymore faxes, it certainly would have been easy to

2    communicate that to the agents at Peer.  It wasn't done.

3    Instead, the faxes were collected and now we've got a

4    lawsuit seeking 500 dollars in damages for each,

5    potentially treble damages, and most importantly for the

6    present purposes, putative class action.

7              We've moved to dismiss the amended complaint.

8    Essentially what plaintiffs now allege is, despite what

9    Congress said in passing first the Telephone Consumer

10   Protection Agent and now the Junk Fax Protection Act,

11   which were very specific in the congressional findings in

12   the language of both statutes, congressional statutes,

13   very clearly indicate that the statute extends only to

14   unsolicited facsimiles.

15             In 2005, the statute was extended to create an

16   exception, and that is the established business

17   relationship exception, which again expanded the scope of

18   permissible facsimiles, made it broader.

19             Plaintiffs now allege that it extends to

20   solicited facsimiles and every solicited facsimile must

21   also contain an opt-out notice, and that allegation is

22   based on FCC rule-making that was subsequent to the

23   enactment of the Junk Fax Protection Act.

24             They also allege that the opt-out notice was

25   insufficient.  Those are the claims.  We think both of

1    those claims don't survive as a matter of law and,

2    therefore, have moved for summary judgment, Your Honor.

3    We also think that it will be impossible for plaintiffs to

4    establish the requirements of Rule 23.

5              I saw Your Honor was about to ask a question.

6              THE COURT:  Well, yes.  In terms of Rule 23, I

7    guess my preference would be to have the class cert motion

8    fully briefed.  I think it's an unusual procedure to seek

9    to dismiss a class through a 12(b)(6) motion unless the

10   entire complaint falls.

11             MR. GLASSER:  Right.

12             THE COURT:  And so I think I'd rather have the

13   class issue fully briefed.  It does seem to me that there

14   are potentially at least two types of so-called solicited

15   faxes that may be at issue here and may complicate the

16   case going forward.

17             You know, one is the specifically solicited fax,

18   as in Nack.  If a sales rep is on the phone and there's a

19   conversation and the customer says, "Yes, I'd like to

20   receive a notice of the upcoming seminar," and it's sent

21   over, that's one form of solicited fax.  The other, at

22   least one other potential form is five years ago someone

23   at the company said they wanted to receive a fax and now

24   they are continuing to receive faxes.  It seems to me that

25   arguably that's a so-called solicited fax, and presumably

1    that is, that latter class is the group of solicited faxes

2    that the FCC was worried about.

3            So, it may well be that that distinction or the

4    potential distinctions of types of solicited faxes would

5    affect the ability to certify the class, but I'm just not

6    sure that issue is one that ought to be decided today.

7            MR. GLASSER:  Your Honor, I think with respect

8    to the point that Your Honor made, the statute and the

9    regulations make clear that if there is a solicited fax,

10   thereafter, faxes received after the solicited fax are

11   deemed also to be solicited until there's a specific

12   request to opt-out.

13           So I think that the two classes -- obviously

14   Your Honor was referring, that latter class falls into the

15   category of the established business relationship, that

16   is, the ongoing relationship between Purdue and Peer where

17   faxes were sent pursuant to that relationship but not

18   necessarily pursuant to a particular request.  You know,

19   "Mr. Glasser, will you give me, will you send me a fax;

20   I'm interested in attending that seminar."

21           As I said, the statute and the regs say after

22   that first request there has to be an opt-out; otherwise

23   the others are deemed to be also solicited.

24           And the second category, as I just said a moment

25   ago, would be, would fall into the exception of the Junk

1     Fax Protection Act established by the established business

2     relationship exception.

3          THE COURT:  Okay.  Let's look at the question of

4     whether the opt-out notice is sufficient under the

5     statute.  The statute specifically provides, doesn't it,

6     that the opt-out notice has to include the timing

7     language.

8          MR. GLASSER:  When Your Honor says "clearly,"

9     I'm not sure I would agree with that.  First of all, I

10    think it has to be clear, Your Honor, that in the first

11    instance -- and again, this is more relevant, I suppose,

12    to class, but I make the point anyway -- in the statute

13    I'm referring to Subsection D of 22 -- Title 47, Section

14    227.  It says that in connection with the established

15    business relationship exception, that notice shall be

16    provided -- "shall provide that a notice contained in the

17    unsolicited advertisement complies with the requirements

18    under this subparagraph."

19         Okay, so that's the first, the statute itself

20    says that the opt-out notice applies only to unsolicited

21    and again, as I say, I think that's more relevant to the

22    claim that it also applies to solicited facsimiles, but

23    we'll get to that later.

24         The provision that I just referred to indicates

25    that the notice is clear and conspicuous on the first page

1    of the unsolicited advertisement and the notice states

2    that "The recipient may make a request to the sender of

3    the unsolicited advertisement not to send any future

4    unsolicited advertisements to a telephone, facsimile

5    machine or machines, and that the failure to comply within

6    the shortest reasonable time, as determined by the

7    Commission, with such a request meeting requirement of the

8    paragraph, is unlawful."

9            It then goes onto say, and I'm referring to

10   Roman four, Your Honor, and it specifically says, the

11   statute articulates that the notice includes -- and then

12   it has two subsections about what the notice must include.

13   The notice must include a domestic contact telephone

14   number, a facsimile machine number for the recipient to

15   transmit such a request to the sender and a cost-free

16   mechanism to do so.

17           So, again, if you look at the statute, I

18   understand that there are other provisions, Your Honor, of

19   the statute which says that the notice also has to contain

20   other things, but I would submit to Your Honor that this

21   particular statute, it's almost -- you know, it's almost

22   deceiving, if you will, because it specifically says what

23   the notice must include under Roman four and then it goes

24   on.

25           So, the paramount intent, it seems to me of the

1    statute is that the notice be clear and conspicuous.  And,

2    quite frankly, the more information that you have got in a

3    notice, the less clear and conspicuous it is.  Even

4    plaintiff's counsel don't argue, or I don't understand

5    them to be arguing that the requirements of Section E need

6    to be included in a facsimile.

7         And if you think about it logically, Your Honor,

8    to include all of that information, and it must be on the

9    first page of the facsimile, would consume the lion share

10   of the fax and -- a page of a fax, and if the whole idea

11   of the statute is designed to eliminate potential waste of

12   the receiving fax in terms of the consumption of paper and

13   toner, including verbiage which would consume the better

14   part of a half of a page of an advertisement, really

15   doesn't make sense in context.

16        It's clear that the import of this is to give

17   the recipient notice that if they don't want to receive

18   further faxes, then all they need to do is call the toll

19   free number.  And it's important in that regard, Your

20   Honor, to look at what the FCC itself said after Notice

21   and Comment Period with respect to the 2006 regulations.

22        In paragraph 25, the FCC for Notice and Comment

23   asked about this topic.  Should we, like they do in other

24   areas, have specific language and I know there's specific

25   language in other areas that Congress has passed.  You

1    need this on a debt collection communication, you need

2    particular language.  They eschewed any particular form of

3    language saying, "We're persuaded that the rules

4    specifying the font size type and wording of the notice

5    might interfere with the facsimile's ability to design

6    notices that serve their customers."

7              So they specifically, as I said, disclaim any

8    particular form or words in favor of a notice that informs

9    the fax recipient of his right to or her right to

10   discontinue receiving faxes.

11             Here, as I've said before, Your Honor, each and

12   every one of the faxes contained information that would

13   allow the PHI employees to call and discontinue, but under

14   the facts of this case in particular, Your Honor, where

15   you have, as I said before, hundreds of contacts with

16   these individuals, all they had to do was tell the

17   detailer, hey, no more faxes.  They never did that.

18   Instead, they continued to accumulate the faxes –– I think

19   I put this in my brief –– I think it's hard to imagine the

20   sequence of events:  You get this fax, and you say, "Oh

21   geez, you look at the opt-out notice and say I don't want

22   to opt-out but you know what?  It doesn't contain every

23   single element of Title 46-227, I'm going to hang onto

24   this and put this in my drawer."  That can't be what this

25   statute is designed to address.  It really is a trap for

```
 1    the unwary.

 2              And here I think again, the paramount import of

 3    the statute is to provide a clear and conspicuous notice

 4    of the right to opt-out.  That was done on each and every

 5    one of the faxes.

 6              THE COURT:  Well, maybe I had better hear from

 7    Mr. Lang.  Yes, instead of commenting, I'll just hear from

 8    Mr. Lang.

 9              MR. LANG:  Your Honor, first off, the FCC has

10    said the time limit that's required.  The cases that have

11    dealt with this issue, post Nack, have set a time

12    limit that's required.

13              THE COURT:  I'm sorry, I'm having trouble

14    hearing you.

15              MR. LANG:  I'm sorry.  The cases that have dealt

16    with this post Nack have determined that the time limit is

17    required in the opt-out notice, and the regulations are

18    clear.  I mean, number two, "State that the recipient may

19    make a request to the center not to send any future

20    unsolicited advertisements and that failure to comply

21    within 30 days is unlawful."  It's clear.

22              THE COURT:  So, help me understand how the FCC

23    can take a statute aimed at unsolicited faxes and turn it

24    into a statute that relates to all faxes, because if it's

25    unsolicited and solicited, it's basically any, any
```

```
1     advertisements communicated by fax has to have this

2     notice.

3             MR. LANG:  Actually, Your Honor, I don't have

4     to.  We were given a United State Supreme Court case

5     yesterday, City of Arlington, Texas v. FCC, U. S. Supreme

6     Court, Number 11-15545.

7             THE COURT:  Right, no, I'm familiar with the

8     case.  Does it say that the FCC can take the word

9     "unsolicited" and convert it to mean all?

10            MR. LANG:  If it's ambiguous and --

11            THE COURT:  How is it unambiguous?  How is

12    "unsolicited" ambiguous?  How does unsolicited include its

13    opposite, i.e. "solicited"?

14            MR. LANG:  There's two arguments to make there.

15    One is by not excluding solicited faxes, there is the

16    implied consent given to Congress -- or excuse me, given

17    to the FCC by Congress.

18            THE COURT:  I don't follow that.

19            MR. LANG:  It wasn't -- solicited faxes were not

20    specifically excluded from the FCC's authority.  Period.

21            THE COURT:  No, but the FCC only has authority

22    to deal with a statute they are given.

23            MR. LANG:  Correct.

24            THE COURT:  They can't, they can't convert a

25    statute that addresses unsolicited faxes and turn it into
```

1    all faxes, can they?

2              MR. LANG:  Yes.

3              THE COURT:  Why?  What's the authority for that

4    proposition?

5              MR. LANG:  Well, the defendants gave me the

6    other argument, and that is in interpreting the definition

7    of the terms that Congress gave them, the FCC then read

8    into the statute that this, that they can regulate

9    solicited faxes as part of their duty and obligations to

10   regulate unsolicited faxes.

11             THE COURT:  It's like saying the police can --

12   are given authority to arrest people who commit crimes

13   and, therefore, they can also arrest people who don't

14   commit crimes.  You know, there's a logical limit to what

15   you're talking about.  The FCC is not Congress.  The FCC

16   can only do what Congress allows them to do.

17             MR. LANG:  And in that instance -- and in this

18   instance, the TCPA has in fact given them the regulation

19   -- or, excuse me, gave them the authority to regulate

20   faxes.

21             THE COURT:  And where do you see that?  Where do

22   you see authority for them to regulate all faxes?

23             MR. LANG:  If you look at the regulations and

24   the statute and read the term "unsolicited faxes"

25   synonymous with "junk faxes," then they have the

1    authority.

2              THE COURT:  But a solicited fax is not a junk

3    fax.  A junk fax is a fax you don't want to receive.  A

4    solicited fax is a fax that you directly or indirectly

5    requested that you receive.

6              MR. LANG:  Well, your Honor mentioned a moment

7    ago there's two types of solicited faxes.  There's one

8    where you say please send me this right now, I've got to

9    have it.

10             THE COURT:  Right.

11             MR. LANG:  And then there's the other group --

12             THE COURT:  And you say the statute bars -- or

13   requires even that fax to have a notice.

14             MR. LANG:  Correct, because that group of people

15   bleeds into the other group that the Court identified, and

16   that is sometime ago, five years ago or maybe it was five

17   weeks ago or five hours ago, I said send me a fax.  Now I

18   don't want them anymore.  By my determination, that

19   becomes an unsolicited fax.  That's where the FCC has the

20   authority.  At that moment there has to be a mechanism by

21   which the receiver of the fax can say I'm done, I don't

22   want anymore.

23             THE COURT:  But if there's an existing business

24   relationship, then they pick up the phone or they send an

25   email and they say, hey, you know what?  Our fax machine

1   is getting tied up with these things, we really don't want

2   them anymore.  Thank you very much.

3           MR. LANG:  Yeah, but then aren't we requiring

4   the FCC to act outside of its authority?  Aren't we saying

5   then the FCC is supposed to regulate these faxes, but if

6   you don't want this fax, then now you have to make a phone

7   call or talk to somebody in person?  Shouldn't it be

8   limited to the fax itself?  The F-A-X?

9           In other words, the fax comes in, it should have

10  a mechanism to opt-out.  That's all the FCC is saying.

11  You can change your mind, you don't want these anymore.

12          I mean look at this --

13          THE COURT:  In this case they have a mechanism

14  to opt-out.  If you take, if you take the assumption that

15  some of these faxes were solicited faxes --

16          MR. LANG:  Okay.

17          THE COURT:  There is a mechanism to opt-out.  So

18  it may be that there is some other problem out there not

19  addressed in this case, but here, every fax had an opt-out

20  provision.  So, the question is whether the opt-out

21  provision of these solicited faxes somehow violates the

22  law, or whether the law has been violated only to the

23  extent that some or all of these faxes are unsolicited

24  faxes.

25          If they are unsolicited faxes, you have a better

```
 1      argument.  If they are solicited faxes, I think you have a

 2      weaker argument.  Because if they are solicited faxes,

 3      then arguably they don't have to comply with subpart D of

 4      the Act.

 5              MR. LANG:  Well, according to the FCC, no, they

 6      have to comply.

 7              THE COURT:  But if Congress didn't give the FCC

 8      authority to regulate every fax in America, but only gave

 9      them authority to regulate unsolicited advertisements

10      communicated by way of fax, then how is the FCC got

11      authority to do what it did?  It's, it's taken a clear

12      statute and it's run way outside the lines, hasn't it?

13              MR. LANG:  Yeah, and isn't City of Arlington

14      Texas full of many examples of that as well?  Where the

15      Supreme Court said, that's okay, we still give them

16      Chevron deference?

17              THE COURT:  Well, even Chevron deference has got

18      some limits to it, doesn't it?

19              MR. LANG:  Yes.

20              THE COURT:  Okay.  So, if the FCC has

21      interpreted a word to mean the opposite of what Congress

22      gave them authority to do, even Chevron I think would

23      allow a Court to say, you know, Alice in Wonderland

24      doesn't apply here.  I mean the Cheshire Cat can say

25      "Words mean whatever I want them to mean," but can the FCC
```

1    do that?

2          MR. LANG:  Sure.  We're talking about receiving

3    faxes.  At some point, a -- and this is where the

4    exceptions come in, at some point the established business

5    relationship or the consent can be revoked and at that

6    point then becomes a unsolicited fax, worthy of regulation

7    under the statute in the regulations.

8          What the FCC is saying is if you're sending the

9    fax and you have permission to send the fax, it needs to

10   have the proper opt-out language in it because at some

11   point it can become an unsolicited fax that the FCC can

12   regulate.

13         And the defendants in their brief help me make

14   this argument.  They are saying they have permission to

15   send as many faxes as they want to these people, and

16   that's what the statute and the regulations they are under

17   are trying to stop.  They sent 40 to my client.  At some

18   point --

19         THE COURT:  And you wish they sent 80 or 100.

20         MR. LANG:  Maybe.  Well, maybe.  It may be the

21   records will show that.  But they are bombarded daily,

22   Your Honor --

23         THE COURT:  Let's just talk common sense for a

24   second.  When I walk back in my office and there in the

25   fax machine is an ad to go to Bermuda for 100 dollars.

1    You know, I'm aggravated and I'm looking on there for some

2    way to make these people stop.  I don't have want to get

3    another ad to go to Bermuda, so how do I call these

4    people?  How do I get off their business list?  I need a

5    notice.

6         But if the company who supplies my copier paper

7    sends me a fax and says, hey, we've got a sale this week

8    on copier paper, I know who that is.  I have an

9    established business relationship with them.  I don't need

10   a notice that says here's the phone number you call.  I

11   call Joe, the delivery guy, and I say Joe, stop sending me

12   this fax.  I don't want the fax.  I'm not buying your

13   paper on sale.

14        So in both cases we have a mechanism to allow

15   the recipient to get out of receiving faxes.  What you're

16   saying is, seemingly, contrary to common sense.  That is,

17   the company with which I have perhaps a daily

18   communication and an existing relationship has to waste my

19   paper and my toner on a notice that tells me what I

20   already know.

21        MR. LANG:  Well, there's another way to tag the

22   authority for the FCC that's regulating this, and that is

23   that the statute is to stop the mechanism by which a third

24   party uses up your toner and your paper at their

25   discretion.  So, I mean that all circles back.

1          But the point I would like to address in that

2    the FCC is not saying they have to send an additional

3    page.  The regulations are on that on the page, on the

4    first page of the fax that you're sending, put a proper

5    opt-out notice.  They're not saying put it in 24 point

6    font, they are not saying put it in a special italics or

7    anything.  They are saying it has to have these elements

8    for it to be okay.  And the defendants here didn't include

9    the time element.  That's it.  That's why we're here.

10         THE COURT:  Well, look, I understand the time

11   element argument and that's a pretty good argument for

12   unsolicited fax.  But the issue I've got is with solicited

13   faxes.  That's how I don't understand the plaintiff's

14   position, frankly.

15         The FCC went -- look, if Congress wanted the FCC

16   to get involved in regulating all fax advertisements, it

17   could simply say "all fax advertisements have to have an

18   opt-out notice that has X, Y and Z."  Why bother with

19   saying unsolicited advertisement time and time and time

20   again in the statute?

21         MR. LANG:  Or Congress could have said here,

22   junk faxes is a problem, FCC, go take care of it.

23         THE COURT:  But they didn't do that.  What they

24   did was they gave them a statute about unsolicited

25   advertisements communicated by way of fax.  And they said

1    write implementing regulations.  They didn't say make up

2    some other problem that we haven't identified and deal

3    with it.  They didn't say deal with all advertisements

4    through fax.  They said, time and again, unsolicited

5    advertisement is what we're trying to stop.  It's just not

6    clear to me where the FCC gets off defining unsolicited to

7    include solicited.

8              MR. LANG:  Well, again, I fall back to the FCC's

9    position, the Bais case, the Vandervort case, the City of

10   Arlington, Texas case; that gives them the authority or

11   that gives the deference to the FCC to  expand its own

12   authority.

13             I'm not sure how to change the Court's mind if

14   I'm interpreting your disapproval correctly.

15             THE COURT:  Well, I'd love to see some argument

16   about some other exercise of regulatory authority that was

17   affirmed by the Supreme Court or the 2nd Circuit that

18   allows a regulator to take a statute that says X and have

19   it mean X plus non-X.

20             MR. LANG:  Again, I thought there were four or

21   five great examples in the City of Arlington, Texas case.

22             THE COURT:  All right, well, I'll take a look at

23   that again.  It's not clear to me that it helps you out

24   here, really.  I don't think that case says Congress has

25   abdicated its authority to the FCC to regulate in this

```
1    area.  I don't think it says that the FCC can define
2    "some" to mean "all."
3              MR. LANG:  I think the problem that we have to
4    recognize that the FCC is facing is how to handle at what
5    point does a solicited fax become a unsolicited fax?  And
6    the logical, practical way to handle that is that it, that
7    a fax that is an advertisement include opt-out language,
8    proper opt-out language.
9              THE COURT:  No, but that's not way that Congress
10   set it up.  Congress set it up saying if you have an
11   existing business relationship, then that's okay.  And so
12   what happens is a fax is unsolicited when a former
13   existing business relationship fades to the point where
14   it's no longer existing.  It's a prior business
15   relationship rather than an existing business
16   relationship.
17             MR. LANG:  I'm not sure that I would concede to
18   Congress the foresight to see the particulars of this
19   argument at the time it drafted the statute.  I'm a little
20   uncomfortable with that.
21             THE COURT:  What does it matter whether they
22   foresaw it or not?  What they said is we have a problem
23   with unsolicited advertisements by fax and we're carving
24   out existing business relationships.
25             MR. LANG:  Yes, but --
```

1          THE COURT:  An existing business relationship is

2    a business relationship that exists at the time the fax is

3    sent.

4          MR. LANG:  Then aren't we also arguing what is

5    the scope of an existing business relationship and what is

6    the scope of consent?

7          THE COURT:  Well, we may well be arguing what is

8    the scope of an existing business relationship, sure.

9          MR. LANG:  And then doesn't the FCC authority to

10   regulate --

11         THE COURT:  No, I mean "we," we here in this

12   courtroom, are looking at that.  Was there an existing

13   business relationship between the plaintiff and the

14   defendant at the time the faxes were sent.

15         MR. LANG:  And then I went to the next step and

16   said that the FCC does have -- I don't think anybody here

17   is arguing that the FCC doesn't have the authority to

18   regulation an EBR or the consent.  And isn't that what

19   they are doing here?

20         THE COURT:  Not if Congress said there's no

21   problem sending fax advertisements if you have an existing

22   business relationship, and then the FCC says, oh, yes

23   there is.  If the FCC directly contradicts the statutory

24   grant of authority, haven't they exceeded even their broad

25   powers?

```
1              MR. LANG:  If the FCC had said, "Best Buy,

2    because you sell fax machines, we're going to require that

3    the minimum wage of your employees be $30 an hour," I

4    would say, yes, they've exceeded their scope.

5              But here, to meet the job that Congress gave

6    them, I think they are within their scope of authority to

7    say when a solicited fax becomes an unsolicited fax to

8    protect the consumers, to say that the consumers are

9    entitled to an opt-out.

10             THE COURT:  Okay.  Well --

11             (Pause)

12             THE COURT:  Well, let me let each of you make

13   whatever further argument you want to make about the

14   motion to dismiss.  And I'd be especially interested in

15   hearing any comments you have about whether the issue

16   we've been principally covering today is best resolved in

17   a motion to dismiss or on a motion for class

18   certification.

19             MR. CLENDENEN:  Your Honor, Pat Clendenen on

20   behalf of Peer Group.  And I just want to reiterate a few

21   points, that we agree that TCPA applies only to

22   unsolicited faxes and same for the regulations regarding

23   the opt-out notice.

24             We think that the first amended, second amended

25   complaint as drafted would substantially gut the statute.
```

1    If you look at their class definition, there's some

2    references in their complaint to unsolicited faxes but,

3    you know, from our perspective that ship has sailed.  We

4    provided evidence that there was consent, that there was

5    an EBR, some of which was disputed.

6         There was a reference at the last hearing that

7    Joan Steiner was also providing an affidavit; we never saw

8    that affidavit.  And they just decided to amend their

9    complaint and basically indicate that any fax that the

10   co-defendant sent, regardless of whether it was solicited

11   or unsolicited during the time period with this opt-out

12   notice is a violation of the statute.

13        We believe that there's no federal cases that

14   indicate that there's TCPA liability under those

15   circumstances.  And we agree with the point or the

16   question that Your Honor raised that, how can the

17   regulations create a cause of action where none exists

18   under the statute.  We just believe that's a wrong.

19        And the argument that the recipients can change

20   their minds in that, if there isn't something in there is

21   really academic here.  As Your Honor pointed out, the

22   faxes here have sufficient information.

23        We also argue as a matter of law that the notice

24   substantially complied.  It's page 17 of our reply brief.

25   And we think that if a -- personally that from the Peer

1    Group's perspective, we believe it's a straight legal

2    issue and that Your Honor can make that determination now

3    without further briefing on the class issues.

4            And the manner in which Mr. Wanca, who signed a

5    lot of the pleadings in this case but hasn't managed to

6    appear before Your Honor, the way they deployed this

7    statute, the Peer Group is a co-defendant in three cases

8    now, one of which was recently filed with one fax

9    attached.  And, you know, from our perspective, the way

10   that they are deploying this statute, in particular now

11   with the opt-out notice, has significant impact on our

12   business.  In fact, our business has been wound down as of

13   November of last year.

14           And now, in two of these cases, the Peer Group

15   has been put to the test of moving for summary judgment,

16   providing evidence through affidavit and business records

17   that the recipients of the faxes provide a consent

18   individually or through their agents, and with the

19   co-defendants, Forest Pharmaceuticals, a case out in

20   Missouri and with Purdue here, showing EBR, you only see

21   Mr. Wanca and his firm retreat and go back to this opt-out

22   notice.

23           So, again, as I say, there's references in their

24   complaint to unsolicited faxes, but when you look at their

25   class definition, they are basically saying and they are

1    arguing here, it doesn't matter, consent, nonconsent,

2    solicited, unsolicited, however you want to phrase it, if

3    it's got a, what they believe is a technically deficient

4    opt-out notice, it's a violation, 500 bucks a pop, ringing

5    up the cash register.

6            And so we believe that these cases, if they

7    had -- should never have been brought and even more so now

8    with this opt-out notice.  So, after almost 20 years of

9    operation, the Peer Group wound down, they had

10   longstanding business, employees with major corporations

11   providing what we believe was a legitimate business and

12   service, and we believe that Congress did not intend to

13   regulate that kind of activity under these circumstances

14   and we pray that the Court follow the long intent of the

15   TCPA and dismiss the case.  Thank you, Your Honor.

16           THE COURT:  Thank you.

17           MR. GLASSER:  Your Honor, if the Court please,

18   my colleague is pulling on my shirt sleeve and wants to

19   address the Court, Your Honor.

20           THE COURT:  That's fine.

21           MS. ELICKER:  Thank you, Your Honor.

22           The defendants were prepared at the last round

23   in oral argument for the Court to rule on its pending

24   motion to strike the class allegations.  Rather than allow

25   the Court to rule on that motion, plaintiff chose to amend

```
1      its complaint.  By amending the complaint, the plaintiff
2      has hung its hat on a peg that the notice provision, in
3      light of the alleged solicited and unsolicited faxes,
4      that's really the only claim that is teed up in the
5      complaint, as Mr. Clendenen said.
6             That's part of the reason why it's appropriate
7      to address this issue now on motion to dismiss.  If we
8      were to have class certification briefing, really it would
9      be all the same issues teed up.
10            Unlike in the first round of briefing where
11     defendant said we would like to the strike the class
12     claims, plaintiff in this instance did not come back and
13     say it was too early.  Instead, plaintiff engaged the sum
14     and substance of defendant's arguments and that is a
15     further indication that really the pure legal issue that
16     right now is teed up is whether this notice provision
17     applies equally to solicited and unsolicited faxes.  If it
18     doesn't, there's no class.
19            The issues that were being discussed before,
20     whether there's -- what is the scope of an established
21     business relationship, what is the scope of consent, all
22     of those issues that would be appropriate to, to address
23     if there were individuals claims, the problem in this case
24     and many other TCPA cases is that those issues are not
25     capable of class by certification.  So, to the extent
```

1    there need to be discussion about the scope of EBR, the

2    scope of consent, they can't be done on a class-wide

3    basis.  And for that reason, to the extent that this

4    complaint raises a claim for a class, it doesn't -- it

5    cannot go forward.  It is legally deficient.

6         Part of the -- one issue that hasn't been

7    discussed today and part of the reason why this is

8    appropriate is of course the FCC has at least two kinds of

9    regulatory authority.  One is under this statute, under

10   227B, Congress specifically granted the FCC authority to

11   promulgate regulations regarding the content of the

12   notice.

13        In addition, Congress says Subsection B that

14   there is a private cause of action for violations of this

15   subsection.  Okay --

16             THE COURT:  Or the regulations.

17             MS. ELICKER:  What for the regulations?

18             THE COURT:  Or the regulations.

19             MS. ELICKER:  Yes, violation of this subsection

20   or regulations issued under this subsection.

21        So, now the FCC also has some more general

22   regulatory authority.  It may have regulatory authority to

23   discuss definitions, to regulate.  If the FCC thought it

24   was an appropriate policy to investigate the duration of

25   consent, perhaps the FCC could issue regulations that

1   would address how long consent should last for.

2            I will footnote that Congress didn't give FCC

3   the particular authority to do that, but let's imagine

4   that the FCC does have that authority.  Well, it doesn't

5   come up under Subsection B, and Subsection B is the only

6   subsection that says a violation of these regulations

7   allows a cause of action.

8            And so that's another reason why you can look at

9   this complaint and say, well, to the extent that

10  plaintiffs are saying I have a cause of action based on my

11  solicited facsimile because it doesn't have a notice

12  provision, the Court is perfectly capable now on motion to

13  dismiss to say that cause of action, that right of action

14  does not exist.

15           So those are the reasons why it would be

16  appropriate to address this at this point rather than

17  allowing class certification briefing.

18           I will also mention that plaintiff did file a

19  motion for class certification, so that issue is currently

20  before the Court.

21           THE COURT:  Right, but the defendants haven't

22  addressed it yet.

23           MS. ELICKER:  True.

24           THE COURT:  Yes, okay.

25           MS. ELICKER:  Unless the Court has any

```
 1    questions, that's --

 2               THE COURT:  No, that's helpful.  Thank you.

 3               Mr. Lang?

 4               MR. LANG:  Your Honor, as a preliminary issue,

 5    we filed a motion for class certification because it's a

 6    tactic de jure of defendants to pick off the plaintiff to

 7    move to class action complaint.

 8               So we're stuck in the bind, we've got some

 9    circuits saying you need to file it contemporaneous with

10    the complaint, some saying not.  So, under caution and

11    under our ethical obligations, the class -- we filed it.

12    And so that's why it's there.  We'd like that to remain

13    pending until we can get into discovery and briefing for

14    the certification.

15               Now, everything I heard the defendants say

16    points to this is a certifiable class.  The issue is

17    simple:  Can the FCC regulate solicited faxes to require

18    them to contain an opt-out notice that contains the time

19    limit.  The determination of that question, yes or no,

20    applies to every member of the class.  Period.

21               If that's not a class that can be certified, I

22    don't know.  This isn't -- and we are here arguing on

23    12(b)6.  Can I make a claim, can I allege that cause of

24    action?  Yes or no.  Based on the Nack amicus brief, based

25    on Bais, based on Vandervort, yeah, I can.  Those two
```

```
 1   cases said certified classes that had solicited and

 2   unsolicited faxes because they had an improper opt-out.

 3            THE COURT:  Right.  There's no binding authority

 4   here.  I don't have to follow any of the cases that you

 5   just cited.

 6            MR. LANG:  Yeah.

 7            THE COURT:  Right.

 8            MR. LANG:  Yes.

 9            THE COURT:  So it's an appropriate issue for the

10   Court to take up.

11            MR. LANG:  Yes.

12            THE COURT:  Right.

13            MR. LANG:  No, I'm not saying your hands are

14   tied.  Your question was, as I understood, isn't this

15   something that's better set for class certification.

16            THE COURT:  Well, that's the question, is it

17   better.

18            MR. LANG:  Yes.

19            THE COURT:  What I'm hearing in argument is it's

20   not better, it's an issue of law.  Why is that position

21   incorrect?

22            MR. LANG:  A determination that is made by the

23   Court will affect the class.  Doesn't that beg notice, to

24   the entire class?  Doesn't that beg, doesn't that

25   trigger --
```

```
 1              THE COURT:  Not if the class hasn't been
 2     certified.  In other words, just because you file a motion
 3     for class certification doesn't prevent the Court from
 4     paring down a claim as a matter of law on a motion to
 5     dismiss, does it?
 6              MR. LANG:  It does if Your Honor grants the
 7     motion to dismiss and it affects the class members' rights
 8     going forward.
 9              THE COURT:  How --
10              MR. LANG:  If there's no res judicata effect
11     going forward, then no.  Then we fall back to the American
12     pipe tolling and somebody can come later and file a
13     subsequent class.  But if they are barred from filing a
14     subsequent case because of the ruling here then --
15              THE COURT:  What's the argument that they'd be
16     barred?  They would be barred if I certified the class and
17     then dismissed the complaint.
18              MR. LANG:  Correct.
19              THE COURT:  If all you've done is make a motion
20     and I say this plaintiff loses --
21              MR. LANG:  Maybe I misspoke.  I said if the
22     ruling on the motion to dismiss would have a res judicata
23     effect going forward, then yes, then we do have to
24     certify.  If it does not, then no, I agree with Your Honor
25     that it doesn't.
```

1              THE COURT:  Well, okay.  I don't think it's

2     going to have a res judicata effect on someone who hasn't

3     been here to argue.  If Tom Smith wants to file this same

4     claim in Courtroom Number 2 next door --

5              MR. GLASSER:  Not invited, Your Honor.

6              THE COURT:  Excuse me -- no, fair enough.

7              But they are going to face an uphill battle.

8     Why?  Because there's now precedence that on identical

9     facts, a judge of this court held one way or the other.

10             MR. LANG:  Correct.

11             THE COURT:  Right.  But --

12             MR. LANG:  Is that res judicata?  No.

13             THE COURT:  It's res judicata against -- well.

14             MR. LANG:  Is the precedent bad?  Yeah.  Does it

15    affect -- I mean --

16             THE COURT:  Well, okay.  My understanding of the

17    law, correct me if you disagree, is that until a class is

18    certified, the members of the class aren't entitled to

19    notice because their rights are not bound up in the

20    decision of a motion to dismiss.  I'm not aware of any

21    case that says an uncertified class is forever barred

22    because a putative class representative lost an issue of

23    law.

24             MR. LANG:  I would agree with Your Honor that

25    that is the law.  As a practical matter, I can tell you

1    that we see those arguments all the time.  But I guess --

2    but I agree with Your Honor.

3              THE COURT:  Yes.

4              MR. LANG:  One final point.  We've talked about

5    the solicited faxes.  We have bypassed the issue of the

6    unsolicited faxes.  Yes, the defendant will say that

7    requires an individual determination as to whether or not

8    they had consent or not.  But it seems to me if some issue

9    is, or if a ruling that the solicited faxes don't require

10   the opt-out, it seems that that doesn't necessarily

11   address that the unsolicited required an opt-out and that

12   the opt-out here is inadequate.

13             So, to the extent that the Court gets to that

14   point in its reasoning, I would advocate that that class

15   should at a minimum remain.

16             THE COURT:  How can you certify that class?

17             MR. LANG:  Well, then we go back -- if I

18   remember correctly, we had discussions before where we're

19   basically talking about computer searches.  The defendants

20   were readily available to show all of the contacts between

21   the named plaintiff.  It seems to me that an easy way to

22   handle that would be to, you could have claims made --

23             THE COURT:  But here's the problem, here's the

24   problem:  It's like certifying a class of all persons who

25   have been discriminated against on the basis of race.  In

1    order to determine whether they are a class member, you

2    have to resolve the merits of the claim and I don't think

3    that's the way that class actions work.

4              MR. LANG:  No, maybe what's troubling is the

5    comment the Court made earlier that it's disputed as to

6    whether or not there was, if the faxes were solicited or

7    not.  As we've alleged, it hasn't.  You know, you get into

8    the argument as to whether or not all of these contacts

9    establish that, you know, the fax could be the other way.

10   I mean these doctors don't want to receive these faxes.  I

11   don't know.  I mean it gets a little -- but I just wanted

12   to apprize the court that that third subset is out there.

13             THE COURT:  And just to be clear, the third

14   subset is what?

15             MR. LANG:  The unsolicited faxes, that they did

16   not include the opt-out.  I don't want the Court to make

17   an assumption that every fax that was sent out was sent to

18   a solicited person or by someone who solicited the fax or

19   by someone who had an EBR.  I don't think that that is an

20   appropriate decision to be made at the 12(b)6 stage of the

21   case.

22             THE COURT:  No, no, fair enough.  This plaintiff

23   who would have the right to proceed further and prove that

24   some or all of the faxes sent by the defendants were in

25   fact unsolicited.

1          MR. LANG:  Thank you for saying it better than I

2     did.

3          THE COURT:  Okay.

4          MR. GLASSER:  And the other point I was going to

5     make, Your Honor, I think my colleague really made the

6     point as well as could be made, about why class is

7     inappropriate, the inherently individualized nature of the

8     inquiries that are going to have to be conducted really

9     will require bone-crushing work, as I say, on a plaintiff

10    by plaintiff basis and on a fax by fax basis.  So, better

11    than I could have said it, underscored the reason why this

12    is not appropriate to go toward as a class.

13         THE COURT:  Okay.  All right, anything further?

14         MR. GLASSER:  We'll rest on our papers, Your

15    Honor.

16         MR. LANG:  Nothing further.  Thank you, Your

17    Honor.

18         THE COURT:  All right.  Well, I'm going to rule

19    in part from the bench today on the motion to dismiss and

20    I'm going to reserve in part and write something up.

21         Whether or not the regulatory scheme applies to

22    solicited faxes is an issue that I'm not going to reach

23    today and I think is appropriate to issue a written ruling

24    on.

25         The remaining arguments the defendants have made

 1   in support of the motion to dismiss I think fail at this

 2   stage.

 3           The substantial compliance argument I think at

 4   the motion to dismiss stage doesn't work.  The statute is

 5   fairly clear about what a notice has to contain and I

 6   think that the substantial compliance argument doesn't

 7   survive a motion to dismiss.

 8           I don't think that the Hobbs Act bars the claim

 9   here.  I don't think that there's an argument that the

10   private right of action that was created by the statute

11   does not reach a properly imposed regulatory

12   implementation of the statute.  And so I think the

13   question is really whether the regulation goes beyond what

14   is authorized.  If the FCC acted within its authority,

15   then it seems to me that the implementing regulations, for

16   example, the 30 day reasonable notice period determination

17   made by the FCC, is an example of a situation in which it

18   would appear to me there would be a private right of

19   action because the statute seemingly creates one.

20           I think these faxes cannot be held to be

21   something other than advertisements as a matter of law

22   and, therefore, although there may be some arguments made

23   later, it seems to me that that argument fails.

24           So, without going into any great depth

25   obviously, I think the critical issue here is the scope of

```
1    the regulatory scheme, the statutory slash regulatory
2    scheme, and whether Congress intended or authorized the
3    statute to require on opt-out notice of the specified type
4    on the, even solicited faxes.
5              So that's the issue that I think needs to be
6    addressed in more detail, and to that extent I'll reserve
7    but otherwise, I'm going to deny the motion to dismiss.
8    Please let me know if anybody wants a more fulsome
9    description of the reasons for the denial, or if I've
10   missed an issue that was raised in the papers.
11             MR. GLASSER:  If the Court would like any
12   additional briefing on that one issue that the Court is
13   going to consider, just would like to know would that be
14   helpful?
15             THE COURT:  I think I've got a pretty good set
16   of briefs here and it's just a question of digging in and
17   sorting it all out.  So I think I'd be -- I don't think I
18   need additional briefing, put it that way.
19             MR. GLASSER:  In preparing for argument, Your
20   Honor, there are a couple other things that occurred, so
21   perhaps just a letter to the Court if that helps?  Copy to
22   counsel?
23             THE COURT:  Let's do it by brief.  If you have
24   something you want to raise, then just make it a
25   supplemental brief.
```

1          MR. GLASSER:  Will do, Your Honor.

2          THE COURT:  All right.  Does anybody want

3     further explanation of the ruling?

4          MR. LANG:  Not necessary, Your Honor.

5          THE COURT:  All right.  Okay.

6          Well, I'll take that up.  It's an interesting

7     question and I appreciate your help with it.

8          MR. GLASSER:  Your Honor, just before you

9     adjourn, I think both parties will assume that discovery

10    is going to remain stayed pending the Court's

11    determination of this matter.

12         THE COURT:  Yes, and then we'll see where we are

13    on the other end.

14         MR. GLASSER:  That makes sense, Your Honor.

15    Thank you.

16         THE COURT:  Thank you both.  We'll stand in

17    recess.

18         (Whereupon the above matter was adjourned at

19    12:00 o'clock, noon)

20

21

22

23

24

25

C E R T I F I C A T E

I, Susan E. Catucci, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ Susan E. Catucci
_____

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917) 703-0761